UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :   No. 3:18CR90(JAM)
                                 :
            v.                   :
                                 :
JOSHUA AMARAL,                   :
                                 :   New Haven, Connecticut
                  Defendant      :   May 1, 2019
                                 :
- - - - - - - - - - - - - - - - x
```

<u>SENTENCING</u>

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
450 Main Street
Hartford, Connecticut 06103
BY:  BRIAN P. LEAMING, AUSA

FOR THE DEFENDANT:

FROST BUSSERT, LLC
129 Church Street, Suite 226
New Haven, Connecticut 06510
BY:  ROBERT M. FROST, JR., ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

| | |
|---|---|
| 1 | **10:48 A.M.** |
| 2 | THE COURT:  We're here today for sentencing in |
| 3 | the matter of United States of America v. Joshua Amaral. |
| 4 | Appearance of counsel, please, for government. |
| 5 | MR. LEAMING:  Good morning, Your Honor.  Brian |
| 6 | Leaming on behalf of the United States. |
| 7 | MR. FROST:  Good morning, Your Honor.  Attorney |
| 8 | Bob Frost for Mr. Amaral who is seated to my left. |
| 9 | THE COURT:  Mr. Amaral, are you doing okay |
| 10 | today, sir? |
| 11 | THE DEFENDANT:  Yes, Your Honor. |
| 12 | THE COURT:  I gather you had a little trouble |
| 13 | getting here, a little delay? |
| 14 | THE DEFENDANT:  A little delay. |
| 15 | THE COURT:  But everything's fine? |
| 16 | THE DEFENDANT:  Yes. |
| 17 | THE COURT:  Back on February 5, 2019, Mr. Amaral |
| 18 | appeared before the Court for purposes of entering a plea |
| 19 | of guilty to two charges.  The first was a charge of |
| 20 | conspiracy to use and carry a firearm in relation to a |
| 21 | drug-trafficking offense, that was Count Three of the |
| 22 | indictment.  The second was to a lesser included offense |
| 23 | of Count Four of the indictment which was possession of a |
| 24 | firearm during and in relation to a drug-trafficking |
| 25 | offense. |

1          So Mr. Amaral, what I'm going to cover today is

2     essentially I'm going to go through some pretty technical

3     matters with the parties, with counsel mostly but a little

4     bit with you.

5          After I'm done with that, Mr. Frost will have an

6     opportunity to speak on your behalf.  You're welcome, if

7     you'd like to, to say anything that you'd want me to know.

8          And then I'll hear from Mr. Leaming on behalf of

9     the government.

10          Mr. Frost, if you have anything to say in

11     response to Mr. Leaming, of course, feel free to do so

12     before I turn to the imposition of sentence.

13          I gather, Mr. Leaming, and I know you had been

14     through related sentencing proceedings, you've been in

15     touch with the victim representatives and it doesn't look

16     like they're here today?

17          MR. LEAMING:  Correct, Your Honor.

18          I've spoken to Victim 2 as has our victim

19     witness coordinator.  I've lost contact with Victim 1.  I

20     asked Victim 2 if he could attempt to track down Victim 1;

21     he was unsuccessful.  Victim 2 was advised of the dates,

22     not only this case but upcoming, although one of them has

23     recently changed, but he's not indicated any inclination

24     to be here.

25          THE COURT:  I understand that.  Appreciate your

1   efforts in that respect.

2          In terms of what I've looked at on the docket,

3   it's essentially everything that's been filed on the

4   docket.  That principally includes the parties' plea

5   agreement, the indictment, the Presentence Report, and

6   also the addendum to the Presentence Report, financial

7   statement, the parties' respective sentencing memoranda.

8          Anything else the parties think I should have

9   seen?

10          MR. FROST:  Your Honor, we had submitted I think

11   to Probation --

12          THE COURT:  Was there a letter?

13          MR. FROST:  Two letters.

14          THE COURT:  I'd like to see those.  We have a

15   different probation officer with us today.  Do you have

16   those?

17          MR. FROST:  Yes.  They're not lengthy,

18   Your Honor.

19          THE COURT:  Could you hand them up?

20          MR. FROST:  Yes.

21          THE COURT:  It sounded like, from your

22   submission, you wished these remain under seal.

23          MR. FROST:  Yes, Your Honor.  We have a letter

24   from Mr. Amaral's mother and his significant other.

25          THE COURT:  Ms. Vasquez?

1                MR. FROST:  Yes.

2                THE COURT:  I'll take a moment to look at these.

3                     (Pause.)

4                THE COURT:  I've reviewed both of those letters.

5     I'll order those to be filed under seal or maybe I'll give

6     it to our probation officer, Ms. Meghan Nagy, who is here

7     on behalf of Ms. Megan Chester who wrote the Presentence

8     Report and ask that that be filed as a second addendum to

9     the Presentence Report.

10               MR. FROST:  Thank you, Your Honor.

11               THE COURT:  So Mr. Amaral, have you read the

12    Presentence Report and also there was an addendum to the

13    Presentence Report?

14               THE DEFENDANT:  Yes, Your Honor.

15               THE COURT:  Have you discussed them with

16    Mr. Frost?

17               THE DEFENDANT:  Yes.

18               THE COURT:  At this point in time do the parties

19    have any remaining factual objections to the Presentence

20    Report --

21               MR. LEAMING:  Not from the government,

22    Your Honor.

23               THE COURT:  -- that you think the Court needs to

24    resolve?

25               MR. FROST:  No, Your Honor.

1          There were I think two open issues indicated in

2    Ms. Chester's response to my letter.  One was related to

3    some disciplinary tickets that it seemed there was a

4    dispute whether those were resolved through an appeal

5    process with the prison.  The other was an objection that

6    I had made to some juvenile --

7          THE COURT:  To looking at that information.

8          MR. FROST:  I don't think that we're pressing

9    those.

10          THE COURT:  I say that the juvenile information

11   I think is -- I would overrule that objection if there

12   were one.

13          On the tickets issue, I'd like to hear a little

14   bit more about what happened there.  That's part of a

15   concern in my mind in terms of -- well, it's been those

16   two incidents, I think they were back in October of 2018

17   when they occurred.

18          MR. FROST:  Correct, Your Honor.

19          THE COURT:  But I know that in prior

20   incarceration periods there have been it looks like

21   numerous violations or numerous ticket issues.  I would be

22   interested in hearing a little bit about that if you care

23   to address that at the appropriate time.

24          And it looks to me just on the front page of the

25   PSR, it looks like -- should it be changed to say for

1    Count Four, should it be -- it says now use and carrying

2    of a firearm.  I really understood the plea to be to

3    possession of a firearm in relation to in furtherance,

4    basically a lesser included offense, wasn't it, that the

5    plea -- is there a need for changing that?

6            MR. LEAMING:  I think technically he entered a

7    guilty plea to the lesser included, yes.  I think he was

8    originally charged in the indictment with brandishing and

9    the plea was to the possession.

10           THE COURT:  All right.  If there's no concern

11   there on any party's behalf, we'll leave the Presentence

12   Report as it is.

13           MR. FROST:  I don't think that that needs to be

14   changed, Your Honor.  I think we covered that in the plea

15   colloquy.

16           THE COURT:  That should be clear enough.

17           MR. FROST:  Yes.

18           THE COURT:  Okay, great.

19           So I'll adopt the Presentence Report's factual

20   statements therefore without objection otherwise to the

21   extent I haven't already addressed any objections.

22           In terms of the Presentence Report's Sentencing

23   Guidelines calculations -- you're welcome to be seated if

24   you'd like -- the final offense level is 21.  It's a

25   Criminal History Category of V.  I believe that that

1    would, according to the Presentence Report's calculations

2    and the Probation Office's position that the sentences

3    should run consecutively, that would suggest a 70- to

4    87-month sentence on Count Three, that's the conspiracy

5    count, and that would be followed by a consecutive term of

6    60 months, the minimum required, on Count Four, that's the

7    possession count.  I understand the parties have

8    essentially agreed, pursuant to *Fernandez*, and urge me

9    pursuant to *Fernandez*, to depart downwards to an overall

10   range of 70 to 87 months.  That's certainly my intention

11   to do that, not to consider a range that would be higher

12   than that, but to keep consistent with what the parties'

13   agreements were and they discussed at length with the

14   Court during the course of the guilty plea hearing.  The

15   supervised release period would be between two to five

16   years.  And the criminal fine range recommendation would

17   be $15,000 up to the maximum of $150,000.  I don't think

18   that there's a restitution request.  And there's a $200

19   special assessment.

20           So does that sound like the right guidelines?

21           MR. LEAMING:  Yes, Your Honor.

22           MR. FROST:  Yes, Your Honor.

23           THE COURT:  Okay.  So I'll adopt those

24   guidelines as well.

25           Mr. Amaral, whenever the Court imposes a

1    sentence -- and I know you have not been in the federal

2    system before, I am sure Mr. Frost would have told you

3    that federal probation and supervision is somewhat

4    different, there's more resources for it than what you may

5    have been used to in prior times.  Part of the Presentence

6    Report talks about various what are called special

7    conditions of supervised release.  These would be

8    conditions that apply following any term of imprisonment

9    that could be imposed.  Paragraph 121 specifies those.

10   And I wonder, I just want to see -- my intent would be to

11   impose those conditions, but Mr. Frost, I just want to

12   make sure that you or Mr. Amaral don't have a concern

13   about those specific conditions, special conditions of

14   Paragraph 121.  Take a moment, if you can, to look at

15   those.

16              (Pause.)

17              THE DEFENDANT:  I have no issues with the

18   conditions, Your Honor.

19              THE COURT:  Okay.  So basically those conditions

20   are essentially not to communicate or interact with

21   members that you know to be from the Latin Kings and

22   participate in educational/vocational programs as well as

23   inpatient or outpatient substance abuse treatment, and of

24   course not to possess a weapon, and to be subject to a

25   search by the Probation Office based upon reasonable

1    suspicion.  Okay.  I intend to adopt those conditions,

2    then, as part of the conditions of supervised release.

3           Let's see here.  I think that's it in terms of

4    the technical matters.

5           I know, Mr. Frost, that you talk in your

6    sentencing memo about issues of receiving credit for the

7    time that Mr. Amaral has been subject to incarceration I

8    think since September 15 of 2017 when he was arrested.  Is

9    there any concern there?  It strikes me that the Bureau of

10   Prisons would pretty much automatically credit that.  Is

11   there anything that I can make of record, because it would

12   be my intention that the sentence I impose would run from

13   September 15, 2017, as it appears it's exactly the same

14   conduct.

15          MR. FROST:  I suppose it can't hurt for the

16   Court to indicate that on the record.  It's my

17   understanding, given what has occurred with respect to the

18   state charges, that by statute the jail credit should run

19   back to September, especially since it's also included in

20   the Presentence Report.

21          THE COURT:  I will say that.  I'll also put that

22   in the judgment that the sentence runs from the date of

23   September 15, 2017.

24          MR. FROST:  Thank you, Your Honor.

25          THE COURT:  That's it, I think, in terms of

1    technical matters.

2            Mr. Frost.

3            MR. FROST:  Thank you, Your Honor.

4            The Court, as you indicated at the outset in

5    this proceeding, has read a lot of information we've

6    already submitted.  I'm going to try not to repeat myself

7    with respect to that and give Mr. Amaral an opportunity

8    after I sit down to address the Court directly.

9            I will say he was working on -- we talked about

10   the idea of having him address the Court directly.  And we

11   did anticipate and plan to have something submitted in

12   writing beforehand.  They had some lockdown issues at

13   Cheshire with some delay in him getting out the written

14   statement which got to me last week.  I did scan it in and

15   was intending to send it along just like I had done with

16   the letters from Ms. Vasquez and his mother, and I didn't

17   have a chance to do that.  So rather than try to take care

18   of that this morning, we agreed that he could read what he

19   prepared.

20           THE COURT:  He's welcome to, of course.

21           MR. FROST:  And also add anything else that he

22   wanted the Court to know before the Court imposes

23   sentence.  So he will be doing that after I finish my

24   comments.

25           All that I have to say is Mr. Amaral is 34 years

1    old today.  As we pointed out in our memo and as

2    Ms. Chester described in the PSR, Mr. Amaral was not

3    blessed with the most stable and supportive of childhoods

4    and home settings.  He had a very difficult childhood.

5    And it was not something that I think -- I certainly

6    didn't -- he didn't disclose that right away or talk about

7    that with me.  He wasn't particularly open about it in the

8    beginning.  But as we got closer to the time of

9    presentence interview and certainly at the presentence

10   interview, he was pretty detailed about some of the things

11   that he had gone through as a young man.  And I was taken

12   aback by, frankly, some of what had gone on both with

13   himself and also with his mother, what had happened to her

14   at the hands of the individual that I think created sort

15   of an abusive environment in the home.

16           And it's not -- and again, Mr. Amaral didn't

17   bring this up and make an issue of it directly himself

18   early on.  It's not intended to be an excuse for anything

19   that he's done.  He's done things in his life that he's

20   not proud of and that the Court obviously has to take into

21   consideration.  He's had problems navigating, you know,

22   his life into maturity.  And some of that, as the Court

23   knows, was influenced by his affiliation with gangs.  I

24   think it explains how he ended up there.  Unfortunately,

25   when he was sort of pushed out of his home, he took refuge

1   somewhere else.  And the streets sort of became his second

2   family.  I think -- and as the Court can see, he's sort of

3   struggled over the years to let the street life go.  That

4   has been sort of an issue for him.

5            I think certainly my conversations with him in

6   this case, he's a very intelligent man.  He does have

7   insight.  And he speaks about what he went through as a

8   child and sort of what he was struggling with in terms of

9   his relationship with people in the gang and on the

10   street.  He does speak about it with insight and

11   intelligence.  Which leads me to believe that he does have

12   it within himself to get passed this.

13            The letter from Ms. Vasquez and in my

14   conversations with her, she shares the same view.  He has

15   it in him, I think, to let this type of life go.  But it's

16   up to him.

17            And he speaks about that, I know, or did speak

18   about it at the end of his presentence interview, that he

19   just wants to live with his wife and his kids.  He has

20   young kids.  He has the opportunity, and apparently when

21   he was home he was an involved father, was helpful, but he

22   has the opportunity to not miss out on a very important

23   period of time in their lives.  And based on what I know

24   of Ms. Vasquez, her work history, what she's dealing with

25   at home without him, it's not easy for her either.

```
 1            THE COURT:  Remind me, what kind of work is she

 2   doing?

 3            MR. FROST:  Food service industry was the last

 4   job she had had at a Friendly's.

 5            THE COURT:  Right.  But not employed, I think,

 6   now?

 7            MR. FROST:  At the time of the PSR, I'm not

 8   sure -- I know she's been trying to get a new job.  She's

 9   had a work history.

10            (Pause.)

11            MR. FROST:  She's still looking for employment

12   at this time.  But she has had work history, and I don't

13   think it's been very easy to do this all on her own.  I

14   think she has some help from her own family.  But

15   certainly having Mr. Amaral in custody is not helping the

16   situation.  And I think he recognizes that.  He has to own

17   that.  But he has what you look for in a situation like

18   this, which is is there hope, is there potential for him

19   to live a mature adult life, a responsible life with a

20   family, with a support network.  He's got one.  But doing

21   this, he's separating himself from that and he's going to

22   continue to fail.  But if he can reconnect with that and

23   see it for what it really is, it's going to make him the

24   happiest and most successful.  If he can do that, stay

25   away from the street, stay out of Connecticut, I know he's
```

1    talked to me about plans to relocate, to get out of

2    Connecticut I think in part because he's also not

3    comfortable with what people affiliated with the gang may

4    think of him.  He wants to get out of Connecticut.  And

5    there is some family I think that's in Florida.

6    Ms. Vasquez is still here in Connecticut and doesn't have

7    any plans to relocate now.  So he is forward-thinking,

8    starting to think about what can I do to have a real

9    responsible law-abiding life.  But it's up to him.

10            So the issue here, as the Court well knows, is

11   to balance sort of the way to help him do that, but also

12   there has to be just punishment for what he did do in this

13   case.  And the government has addressed that in its memo.

14   This was a potentially very, very, very serious incident

15   involving guns and an altercation that was violent enough,

16   but could have been a lot worse.  Fortunately, it did not

17   result in anybody being killed.

18            But I think we've tried to explain that -- and I

19   don't know whether the Court has, but I've watched the

20   video, spent time looking through that.  Mr. Amaral was

21   present and is, obviously, as he's admitted, he possessed

22   a gun in anticipation of potentially something happening.

23   But ironically, when the events sort of started to unfold,

24   he didn't pull out his gun and start shooting or anything

25   like that.  He turned around and faced with other

1  individuals who were there, they drew and started

2  shooting.  And Mr. Amaral, who was a short distance from

3  one of the victims, actually throws his hands up at one

4  point and turns around and runs, ends up getting shot, but

5  I think those facts sort of mitigate it to some extent.

6  This is not something where he was bringing a gun, drawing

7  it, pistol whipping, doing something that would be --

8              THE COURT:  He says he got the gun from another.

9              MR. FROST:  Correct.  He essentially just had

10 the gun on him.  There is a brief moment I think later as

11 he's running back across the street, down the street to

12 take refuge behind a car that it looks like a pistol may

13 be visible and hands it off to another co-defendant.  But

14 certainly he's not similar to some of the other

15 individuals in this particular confrontation who actually

16 were drawing weapons and discharging them.

17             But the problem with, and the reason why the

18 government prosecutes these cases is that there's always

19 the potential for that when guns are present and you bring

20 guns with you when you're not allowed to possess them.

21 Particularly when it's in relation to, as the government

22 has pointed out, illegal activity, something related to

23 drugs.

24             So, you know, the crime is a serious crime.  But

25 I think there are some facts and circumstances about

1    Mr. Amaral's role in it that make it somewhat less serious

2    in terms of what the Court needs to consider as far as

3    just punishment.

4           The Court has already addressed the issue of the

5    guidelines, so I won't revisit that.

6           As far as the other two things I would say about

7    the statutory factors which we address in our memo is,

8    number one, the longest -- and this is in the PSR as

9    well -- the longest period of continuous incarceration

10   that Mr. Amaral has had in his life is 24 months.  It's a

11   little bit on an installment plan, I suppose.

12          THE COURT:  There's been something like 135

13   months.

14          MR. FROST:  There's been other periods of time,

15   violations of probation and other things.  But the longest

16   period of time that he's been incarcerated continuously is

17   24 months.  So if the Court sentences within the range of

18   the 70 to 87 months, that sentence would be, by a factor

19   of two and almost three, greater than what he's ever done

20   in one long stretch of time.  That's a lot of time to

21   think and reflect upon what you're going to do when you

22   get out.  It's a lengthy period of time for anybody to

23   serve in prison.  It sends a serious message about the

24   Court's view and society's view of the conduct that

25   occurred here.  And so -- and in terms of its impact on

1    Mr. Amaral, I think it will carry a greater deterrent

2    impact on him.  That's a really long time.  Especially

3    when at the times he served some of his other sentences,

4    he wasn't necessarily -- in some instances wasn't yet a

5    father, doesn't have sort of that family that's waiting

6    for him.  So being separated from that for that period of

7    time and how long it is, that will be significant for him.

8            The second point I would make is that if the

9    Court, in trying to gauge where the Court is considering

10   sentencing within that range of 70 to 87 months, where in

11   that range Mr. Amaral should fall, if the Court is

12   thinking of having -- we have obviously asked for the

13   bottom of that range.  But if the Court is thinking of

14   additional punishment because somehow 70 months and the

15   period of supervised release is not sufficiently lengthy

16   enough to accomplish the goals of sentencing, I think what

17   U.S. Supreme Court and what the sentencing case law has

18   said is that the first thing that should be explored there

19   is potentially, well, would more supervised release, which

20   is also punishment, be a better substitute than more jail.

21   And so if the Court is thinking, well, 70 months, I feel

22   like there should be -- and a period of supervised

23   release, I think what the Court should think is 70 months

24   but as long as supervised release is appropriate under

25   this circumstance, which would be five years, for example.

1    It could be less, but I think the way that the statute

2    reads and the way the case law has developed, is that the

3    Court should consider that because it is punishment.  It's

4    supervision, there's restrictions on you.  There's also

5    the possibility that if Mr. Amaral returns to some of

6    those old ways that he carried out in the past where he

7    wasn't a model individual on probation, state probation,

8    these were all state probations, if he returns to that the

9    Court can impose additional jail time as it can in state

10   court, but that means that whatever sentence, 70, 75, 78,

11   he's going to get time on top of that.  So I think there's

12   a way to structure the sentence that adequately punishes

13   Mr. Amaral for his conduct, addresses society's concerns

14   about what kind of message are we going to send here for

15   what occurred here, deterring him from doing it again,

16   doing it in a way that is not going to result in a

17   sentence that's going to be wildly different than any

18   other defendant in this case or in some other courthouse

19   and gives him sort of at least some structure and a

20   platform to prove to all of us that he's got it this time

21   when he does finish his sentence.

22          And again, as I said at the beginning of my

23   comments, then it's on him.  If he doesn't do that, this

24   cycle will continue.  His family will probably not, you

25   know, know him or his children will not know him the way

1    he probably wants them to know him.  And, you know, what

2    began as a very sad story when he was a child will

3    continue.  That means that what happened to him as a child

4    will basically, he won't be able to get free of that, it

5    will basically carry through to his adult life, and it

6    will be a tragedy.  So I think he gets that.  I hope he

7    does.

8           And so it would be our request, Your Honor, as I

9    said in the memo, that the Court impose the low end of

10   that 70 to 87 months.  And if the Court is considering

11   additional punishment, to lengthen the period of

12   supervised release.  He obviously can't pay a fine, so we

13   would ask that that not be imposed based on his financial

14   situation.  And impose, obviously as the Court had talked

15   about, some of those special conditions listed in the PSR.

16   I think, as I said, he needs to get his GED.  The fact

17   that he doesn't have one it's hurting him in his BOP

18   designation, it's hurting him I think in life.  He needs

19   to get that under control.  And as I think he's sort of

20   identified, he needs some vocational training.  He made

21   the comment, "I don't want to work in the food industry."

22   Well, you've got to get something to earn that.  You've

23   got to get some skills, you've got to do something that

24   sets you up to do something other than that if that's not

25   what you want to do.  If you want to go into some sort of

1    trade, you're going to have to work on that.  So again,

2    whether he can get some of that in prison or when he's on

3    supervised release and has some support, there is more

4    support in the federal system, he can work on those

5    things.

6         Finally, I've indicated to him that this

7    district has some great opportunities and resources for

8    people like him that may be coming out and looking to get

9    their feet on the ground.  Reentry Court is one.  Our

10   Probation Office in general is a very good office.  He

11   should use it.  And again, it will be on him.  People

12   aren't going to do it for him.  But that would be our

13   request for a sentence.

14        As far as facility designation, I'll say it now

15   in case I forget to say it at the end of the proceeding is

16   that in the judgment we would request that Mr. Amaral, the

17   way I've scored him out, it does appear that he would be

18   high security, so it would be a USP is my understanding

19   based on the offense and other points that he accumulates

20   under the BOP manual.  So we're requesting USP Allenwood

21   which is in Pennsylvania and would facilitate visitation

22   with his family and children, and so we would request that

23   that be included in the judgment.

24        And with that, I want to give him an opportunity

25   to address the Court.

1          THE COURT:  Did you want to say something about

2     those disciplinary tickets?

3          MR. FROST:  I am aware of them.  The tickets

4     that we had flagged were sort of an unusual situation

5     where I guess Mr. Amaral and Ms. Vasquez had had some

6     domestic issue in the past.  She was identified as a,

7     quote/unquote, victim.  And I guess once that gets logged

8     into the system at the DOC he's not allowed to have any

9     contact with her.  He was freely having contact by phone a

10    long time later where there were no issues.  And because

11    she was a prohibited person, he got a ticket.  He did

12    appeal that, and that was what he had flagged for me and I

13    indicated to Ms. Chester he appealed that.  Our

14    understanding was that it had been reversed.  But we

15    weren't able to get any more clarity on that.

16          And just so Mr. Amaral appreciates it, there's

17    also other activity mentioned in the Presentence Report

18    which the only thing I can say is he does touch upon or

19    did in his presentence interview that when he was younger

20    and going to -- in the Department of Corrections, he was

21    affiliated with the Latin Kings.  And as a young man at

22    that time I think he actually looked up to the people that

23    he was seeing in those facilities, he was at Northern at

24    one period of time, and I think was in awe, as a young

25    man, wrongly, but at the time he was.  And so some of his

1    behavior reflected that, that he was listening to people,

2    not correctional officers, DOC administration, rules and

3    regulations, he'd listen to those people.  And I think he

4    spoke to that during his presentences interview.  He has

5    some insight on that that that was foolish.

6           I think the harder question -- and I'll let him

7    deal with it -- when he finally does come out, you know,

8    he ends up sort of falling back in the same activity and

9    because he wants to return to getting involved with drugs,

10   the person who is running the show, so to speak, in that

11   part of Hartford is Mr. Velez.  That's the gatekeeper.

12   That's how you have to, you know, behave.  But if he

13   didn't return to the drug dealing, he probably wouldn't be

14   here today.  He wouldn't be affiliated with Mr. Velez,

15   wouldn't have been asked by Mr. Velez to go with him that

16   day.  So the question he's got to ask himself is why he

17   made that choice.  It's one thing to do these things when

18   you're younger, you're in the facilities and you're in awe

19   of these gang members and everything else.  At some point

20   he's indicated that stopped.  Well, why did he go back to

21   this life?  Which I'll let him address that.

22           THE COURT:  So I wonder if maybe -- and it's

23   fine for Mr. Amaral to address it as well.  The question I

24   have is how does it come about, even after basically he

25   escapes with his life and he's shot, as Mr. Leaming notes

1    in the government's memo, he's -- it's not too long before

2    he certainly is selling fentanyl, the worst of the worst,

3    really, killing drugs.  And then apparently, according to

4    the wire intercepts the government has, there's discussion

5    about him having actually tried to shoot somebody else.

6    Then it looks like he gets on the wrong side of Mr. Velez.

7    So I'm interested in knowing a little bit.  So oftentimes

8    I see folks who come in and I wonder what is it that they

9    can point to that says that they've turned things around

10   in terms of actually what they've done in some way.  How

11   does getting shot not kind of wake somebody up?  I know

12   that's not the first time he had been shot.  I'm just

13   trying to figure that out.  That's a puzzle for me.

14            MR. FROST:  Your Honor, I would indicate to

15   Mr. Amaral rather than me trying to address, which I'm not

16   really in a position to do, I asked if he'd be comfortable

17   addressing the Court's question, and he's going to address

18   the Court on that.

19            THE DEFENDANT:  I continued to go back where

20   everything started because in my mind that's all I knew.

21            And as far as Velez, I knew Velez for over 17

22   years.  Me and Velez was in a cell in Northern for about

23   four years.  I did two years, came back to jail, he was my

24   cellmate again for another two years.  When I got released

25   from prison, I just felt like I owed him something,

1    because I ain't had no family support.  Financially, he

2    was my support system.  So when I came back to that area,

3    I just felt like I owed him.  To help his enterprise out,

4    I guess.  And to help myself out to make a few dollars, to

5    be honest.

6            But as far the shooting that the wiretaps said I

7    was involved in, I never fired a firearm at nobody.  I was

8    tested, gun powder at the police station.  They didn't

9    find anything.  I wasn't the shooter that night.  I would

10   just assume, because of the problem I was having with my

11   affiliation with Latin Kings at that moment, that they

12   assumed it was me who fired upon one of them, but it

13   wasn't.

14           You don't mind if I could read this letter?

15           THE COURT:  That would be helpful.

16           Maybe I'll ask you to come up to the lectern if

17   you don't mind.  It's a little easier to read from there,

18   I think.

19           THE DEFENDANT:  Dear Judge Meyer, I'm truly

20   sorry for being part of this indictment.  I take full

21   responsibility for my involvement.  I screwed up by

22   staying in that environment subjecting myself to horrible

23   situations.  I have no one to blame but myself.

24           I promise to take advantage of everything

25   federal prison has to offer.  I will get my GED and pick

1    up as much job trades as I can.  I'm going to do whatever

2    it takes to make my transaction back to the society

3    easier.  My fiancée okays on moving out of state so we can

4    start a new life with a better environment.

5          I'm ashamed and embarrassed that I put myself in

6    a predicament where I can't be a father to my children.

7    All I can say is that it won't ever happen again.  Nothing

8    means more to me than being a father.  I'm a good person

9    with a good heart who made a horrible choice by being

10   there when this incident took place which I regret every

11   day.

12         Thank you for taking your time out of your day

13   to read my letter.  Once again, I'm truly sorry for my

14   actions and for being part of this indictment.

15         THE COURT:  Thank you, Mr. Amaral.

16         A couple of questions for you.

17         Prison, what's prison like?  You've been there

18   so long, you've been so many places, Northern, Cheshire.

19   What's it like?

20         THE DEFENDANT:  It's horrible.  It's just -- I

21   don't want you to take what I say the wrong way, but when

22   you're accustomed to something you know how to adjust it.

23   I've been coming in and out of prison so long that what

24   used to bother me a lot, the routine, it just became

25   secondhand to me.  Just being away from my family is the

1    main thing that hurt me.  But like I told my attorney at

2    that point in time in my life, I felt obligated to my

3    affiliation because of them -- as me being child at age

4    13, they took me in.  At that time when I was catching all

5    those tickets, I wasn't thinking about my life, I wasn't

6    thinking about myself.  I was thinking about them.  Just

7    everything was about them at that period.

8          But at this time in this period of my life I

9    don't want nothing to do with them.  I don't want to do

10   gang activity anymore.  It's been doing nothing but

11   separating me from my family and taking time out of my

12   life.  I'm getting older now.  I'll be 35 in a few months.

13   I can't continue to subject myself to that behavior.

14         And as far as the ticket history, it's true.

15   All the tickets I was a knucklehead.  I wasn't trying to

16   change at that period.  Like he said, that was the best

17   way to describe it, I was in awe.  I felt like them was

18   guys to look up to.  That's all I knew at that period.

19         As you see now, I have -- besides the situation

20   I caught with the phone with Tanisha Vasquez, I have got

21   no disciplinary reports since being in prison.  And the

22   only reason I caught that one is because DOC passed a

23   policy, it's called once a victim, always a victim no

24   matter if the case was dismissed, no matter if your case

25   was nolle'd, if you contact anybody who was arrested for

1    it, you get a disciplinary report.  So she's my only

2    support system.  Her and the kids is all I have.

3              THE COURT:  I see.

4              THE DEFENDANT:  You know, I just felt I kind of

5    let them down.  They is the reason why I'm changing now.

6              THE COURT:  So, Mr. Frost mentioned programs

7    that are available when you're done with the prison

8    sentence.  One of those is something called the Reentry

9    Court.  There's one up in Hartford that a different judge

10   runs and does.  I do one here in New Haven.  But I'll tell

11   you, one of the things I hear from the guys oftentimes who

12   have spent more time than you in prison is an absolute

13   conviction that they just never want to go back again.

14   Are you at that point?

15             THE DEFENDANT:  Yes.

16             THE COURT:  They literally come into this

17   courtroom and they talk about how they feel like every day

18   is a good day because no matter what's happened that day,

19   it's nothing compared to what, you know, prison was like.

20   Their worst day out here is better than their best day in

21   prison.

22             THE DEFENDANT:  It's like -- it ain't just me I

23   got to worry about no more.  My daughter is becoming a

24   young woman now.  It's not my life I'm really worried

25   about; it's them.  I want to be there for them through

1  high school, middle.  She's becoming a woman, I want to be

2  there to support them in every way.  I can't be living

3  this type of life.

4       THE COURT:  So Mr. Frost started off when he

5  started talking about you -- and he doesn't say this about

6  every person who he represents, I've had him in other

7  cases, he's a great lawyer -- he talked about how you're

8  very intelligent.  And so I'm trying to understand even

9  despite the fact that you don't have formal education, you

10  clearly are very bright.  I can tell just by the way

11  you're talking to me now.  What's it take for you to

12  figure out, okay, well, you know, I need to set a real

13  career path here.  You're going to have possibilities

14  actually to do that.  I know you spoke to Ms. Chester, I

15  think, about the possibility of maybe a commercial

16  driver's license or other --

17       THE DEFENDANT:  I just feel like if I really

18  want to change and live a normal life, I have to expose

19  myself to things that's going to keep me out of prison

20  which is job trades, which is financial stability legally.

21  I won't be drug dependent, I won't have to feel like I

22  have to sell these drugs or whatever.  I want to be

23  financially stable legitimate-wise.  I want to have a

24  career.  I want to be a plumber, I want to be HVAC or a

25  trucker, I want to have something that will prevent me

1    from putting myself in these predicaments.  I got kids

2    that's depending on me.  The only way I feel like I won't

3    fall in my old patterns is if I do everything now to

4    prevent that from happening with job training and getting

5    my GED and just not looking back at all.

6              THE COURT:  I see.

7              You talked about not working in fast food.  Part

8    of going back to work might mean you're going to have to

9    work at a job that you're not crazy about.  It could be a

10   graveyard shift at a warehouse or something.  I'll just

11   tell you, I hear a lot of the guys who, again, who take

12   part in Reentry Court, they have those jobs.  And they

13   want better jobs.  They do.  But they also say it just

14   feels so much better to have 100 bucks from that job even

15   though it's not nearly as much as they had when they were

16   drug dealing.  They feel much better about having that

17   money, as limited as it might be, because it's legit.  And

18   the people around them and their family and their kids

19   actually respect them.  You could have that.

20             THE DEFENDANT:  I want to have that.  I want to

21   just go home and just be able to not worry about coming to

22   prison the next day or whatever I'm doing is going to lead

23   me back to prison.

24             THE COURT:  You could have it if you decide to

25   turn things around and get the job, as hard as it's going

1    to be, and stay off the drugs.  Because if you're

2    self-medicating yourself with that, you'll never make

3    those right choices.  You've got to know that.  Your two

4    youngest, especially, they don't know you're in prison.

5    They think you're in school, right?  So, you know, you can

6    basically really turn this around.  They'll learn at some

7    point, but the person they know won't be that person who

8    just lives in prison and cycles in and out of prison.  You

9    could do much better.

10            THE DEFENDANT:  You're right.  It just seems now

11   that stuff I used to be proud of back when I was a kid I'm

12   ashamed of now, being in prison, being involved with this

13   stuff.  I never felt that way before.  It's just you could

14   say I woke up.  Third eye opened up, I guess.  And I

15   really started seeing stuff for what it is.  I've been

16   embarrassed and ashamed to be the person I've been these

17   past couple of years.  I'm not proud of that.  There's

18   nothing -- I am ashamed of who I was.

19            THE COURT:  Do you do anything to help other

20   people other than your kids?

21            THE DEFENDANT:  What's that?

22            THE COURT:  Do you help other people?

23            THE DEFENDANT:  Yes.  My father before he passed

24   away.  I used to help my father and my grandmother.

25            THE COURT:  Tell me about that.

1           THE DEFENDANT:  My father was drug dependent on

2    heroin for a long period of time.  He had no -- everybody

3    looked at my father as an outcast.  But he's my father.  I

4    only got one father, you know.  So I had to be there for

5    him, financially-wise or emotionally-wise.  My grandmother

6    as well.  My grandmother took him in.  It was hard for her

7    to keep up with the bills.  It was hard for her to deal

8    with his drug addictions.  And I sometimes just go over

9    there and drink a cup of coffee with her and just talk to

10   her.  I understand it's hard to see her son go through

11   that.  I was telling her she's not alone, he's my father,

12   I understand her pain.

13          THE COURT:  Good.

14          So I'm going to impose a sentence of

15   imprisonment today and there's going to be conditions on

16   that.  I've already talked about some of them.  You'll

17   have time, as Mr. Frost stated, more time to think about,

18   okay, what's going on.  What did I do wrong?  How did I

19   screw up?  How have I screw up so many times in the past?

20   Then you'll have time to think about, what's going to be

21   different?  How am I going to be different in the future?

22          Mr. Frost would tell you that when you come out

23   and you start on conditions and you're tested for drugs,

24   what can happen is if you have positive drug tests or what

25   would happen if you have positive drug tests or if you're

1    getting arrested for other stuff or basically being in the

2    wrong car with the wrong person, stuff that happens, you'd

3    be back here.  The probation officer, probably not

4    Ms. Nagy, it would be another probation officer, they make

5    an immediate report to the Court.  And when I look at

6    those, when I see somebody who has something about guns,

7    in other words, somebody who is kind of at the risk of

8    ever having a gun, I really err on the side of nipping in

9    the bud and putting the person back in jail.  Because it

10   just tells me, oh, my goodness, the person is not learning

11   their lesson.  They think they can violate little

12   conditions.

13             You know, in 2016, you were in the halfway house

14   and you had an escape.  So if you had that kind of

15   mentality -- and you've had this, you've cycled in and out

16   of probation, violations and all that.  And what's changed

17   is you're older now.  But I have to tell you whatever term

18   of imprisonment I impose, you're going to be back on

19   conditions, it's going to be for several years.  You've

20   got to decide what you're going to do.  You just need to

21   know if you start messing up again, I've got to protect

22   the community first.

23             THE DEFENDANT:  You're doing the right thing if

24   I go home and decide to take that path.

25             THE COURT:  Hopefully it won't be that way.

1    Hopefully I'll run into Mr. Frost and he says, wow, I

2    heard from Mr. Amaral, he's doing great.  He's got a job

3    and things are really doing well.  That's hopefully the

4    news I'd hear.

5             THE DEFENDANT:  That's the only news.  I'm not

6    going to subject myself to nothing else.

7             THE COURT:  Anything else you want me to know?

8             THE DEFENDANT:  I don't want you to feel like

9    I'm putting the blame on anybody else.  I understand that

10   my actions was my actions regardless of what.  I take

11   responsibility for just being here.  I'm sorry.

12            THE COURT:  Thank you, sir.

13            Mr. Leaming.

14            MR. LEAMING:  Thank you, Your Honor.

15            There are a number of factors I'd like to talk

16   about I think that are important for the Court's

17   consideration.

18            The first one, what sort of struck me when I

19   read the PSR was how Mr. Amaral described his role in the

20   case or his explanation as to how he became involved in

21   the April 2017 shooting.  And I think that's important

22   because how a defendant or an accused sees the conduct

23   with which he's charged I think is significant in sort of

24   predicting how serious he views it and the potential for

25   successful rehabilitation.  He stated that he was not

1   going to commit a violent crime when he went to Barker and

2   Franklin Avenue that day and describes himself as

3   lingering as if he didn't really want to be there, that he

4   was somehow under the undue influence of Mr. Velez.

5   There's a couple facts that I think would be helpful for

6   the Court to sort of put in perspective.

7           When Mr. Velez called Mr. Amaral that day

8   because they had a problem, Mr. Amaral was willing to go.

9   When Mr. Amaral got in the car, he was told what they were

10  going to do, which was they were going to take this drug

11  dealer off the corner.  And Mr. Amaral was willing to do

12  that.  Mr. Velez gave Mr. Amaral a gun.  And Mr. Amaral

13  was willing to take it.  And I got some sense that maybe

14  it wasn't so -- maybe somewhat less serious because he

15  didn't himself bring a gun, but I look at it as of all of

16  the five people that were there, Velez gave Amaral the

17  gun.  He didn't give it to the guy who he thought would

18  linger or hide out in the car or the person he thought

19  would be reluctant to use it if called upon.  They're

20  going to a street corner in the middle of the day to

21  intimidate another drug dealer, and he gave this man a

22  gun.  Because he could trust him.  Because he knew that if

23  that gun needed to be used, Mr. Amaral would use it.  That

24  if it came to that point, certainly Mr. Velez didn't

25  hesitate as to who should have the gun: it was Mr. Amaral.

1          Mr. Amaral described how he never pulled out the

2    gun, he didn't pistol whip anybody, he didn't shoot

3    anybody.  I want to give the Court a little bit of

4    perspective of what is actually going on on that street

5    corner.

6          The initial confrontation was only with

7    Victim 1.  Victim 1 was the one who was selling drugs.

8    And Victim 1 was initially confronted by two unidentified

9    men who said you can't be out there.  And Victim 1

10   basically told them go pound sand, I can do whatever I

11   want.  That resulted in Mr. Velez and the rest of the crew

12   coming.  What Mr. Velez and Mr. Amaral didn't know was

13   that Victim 1 had called Victim 2 and said I might have a

14   problem out here, and that Victim 2 had a gun.  And he had

15   a pistol permit to carry that gun.

16          And so Mr. Amaral, Mr. Velez, Mr. Claudio all

17   come out to the block, they're not worried about anybody

18   but Victim 1.  They don't know there's another man there

19   who presents a potential threat to them.  And so, as

20   described in the sentencing memo, that the focus is on

21   Victim 1.  And at one point all five men, including

22   Mr. Amaral, have surrounded Victim 1.  And even, by

23   Mr. Amaral's own account, Mr. Claudio takes a gun off of

24   Victim 1.  And it's at that point they believe they

25   certainly have the advantage, there's five against one.

1   We know that Mr. Claudio has a gun and we know Mr. Amaral

2   has a gun.  From their perspective, it's two against zero.

3          And what happens?  Mr. Cabrera sucker punches

4   Victim 1.  There's essentially a group attack of Victim 1.

5   And they chase him across this short paved area in front

6   of the bodega.  And who is in the front of the pack?

7   Mr. Amaral.  The man with the gun.  Why Mr. Amaral is

8   lucky is because he didn't know about Victim 2 who had a

9   gun, and when he saw this group of men attacking his

10  friend and coming towards him, he shot Mr. Amaral.  That's

11  why he ran.  Because it's true, he was now faced with

12  somebody who had a gun who was literally probably 5 or

13  6 feet away from him.  And he ran.  Taking the gun out and

14  hiding behind a car.

15         THE COURT:  Did he put his hands up as Mr. Frost

16  suggests?

17         MR. LEAMING:  No, I don't view it as that.  He

18  gets shot.  It's not like I surrender.  I think the

19  shot -- there's no moment -- I mean, it's so quick that

20  when Victim 2 pulls out his gun and fires, there's no I'm

21  holding up my hands and then get shot.  I think he's shot

22  and he stumbles, puts himself obviously trying to get out

23  of harm's way.  You can see from the video everybody

24  instantaneously either scatters or dives to the ground.

25         But what we have here is this group of men,

1    including Mr. Amaral, have created the circumstance which

2    caused him to be shot, which could have easily caused

3    other individuals to be shot.  As I indicated, this is one

4    of the two main thoroughfares that run through the

5    South End of Hartford in the middle of the day.  And

6    they're waging a gun battle.

7              Now, you can say Mr. Amaral, well, he ran away.

8    Well, he was shot.  I don't think that means I didn't go

9    there to think I was going to commit a violent crime.

10   That's exactly why he went there.  That's exactly why

11   Mr. Velez encouraged him, invited him, and said, "You're

12   coming with us, we've got a problem."  The fact that he

13   doesn't see it that way tells the government and me

14   personally that he doesn't get it.  And if he doesn't get

15   it now, I don't think he's going to get it after a few

16   years in federal prison.  Which tells me that there's a

17   strong compelling need to protect the public from

18   Mr. Amaral specifically.

19             And the fact that he has a family that he wants

20   to get back to doesn't diminish that real danger.  Because

21   that family existed in 2017.  That same girlfriend, those

22   kids.  And so that fact doesn't, in the government's view,

23   impact the need to protect the community.

24             I first came to know of Mr. Amaral in 2009.  He

25   was a Latin King.  Then you're 22, you're 23, it's not

 1   acceptable, but better understandable.  He's committing

 2   these crimes at 32 and 33 after a lifetime of living the

 3   life that he knows is fraught with criminal activity,

 4   violence, drug dealing, the scourge of the community.  But

 5   he spends his entire adult life either living the life of

 6   a Latin King inside or outside of prison.  And here he is

 7   in April of 2017, as I indicated in my sentencing memo and

 8   as the Court indicated in its comments, most individuals,

 9   the vast majority would say I got lucky today, I only got

10   a gunshot in the leg.  Mr. Claudio everybody thought was

11   going to die.  He was in a coma for three months.  I had

12   to think that Mr. Amaral thought that that could be me.

13   You know, Mega is not going to make it out of the

14   hospital, he's going to die there.  And while Claudio is

15   in a coma in a hospital, Mr. Amaral goes right back out to

16   selling drugs.

17          And those wire intercepts, while he can profess

18   I didn't shoot somebody, it's clear that he's in the

19   middle of something he shouldn't be in.

20          Remorse and regret are plentiful in a courtroom

21   the day of sentencing.  Words of remorse and regret are

22   helpful to hear, but they have to be, especially in this

23   instance, viewed sceptically.

24          One of the drug sales that were part of the

25   indictment, he sent his girlfriend to do the drug deal

1   while he stood on the corner watching it go down.  He was

2   on pretrial release from the April shooting when he got

3   arrested for the felon-in-possession charge.  Those

4   actions, that conduct says so much more than the words

5   that "I want to be there for my children.  I don't want to

6   worry about going back to prison."  Nobody wants to go

7   back to prison.  It's easy to say those words.  It's much

8   harder to believe that the life that he's lived and the

9   decisions that he made can overcome those just because he

10  says he wants to.

11          Deterrence, you can read the Presentence Report.

12  He's not even a good prisoner.  Much has been made about

13  the most or the longest period of actual incarceration is

14  two years.  Okay.  I think we've all realized that those

15  sentences and the cumulative 11 years he's spent in prison

16  have done nothing to protect the community or to deter

17  him.

18          When I look at the case and I say to myself, you

19  know, we're all sort of a product of our own making, but

20  we're required to look at the Sentencing Guidelines ranges

21  as the starting point.  And sometimes it's a really good

22  thing.  Sometimes we get perhaps tethered to it in a way

23  that we shouldn't be.  I agreed in this case that I

24  thought notwithstanding the operation how the 924(c)

25  operated, it was never sort of the intention of the

1    parties and it's certainly not my intention to say 130

2    months was where he should be based upon the conduct and

3    the other factors that the Court must consider.  But when

4    I look at the range, I look at the fact that he was on

5    probation, he's picked up another drug case earlier from

6    the state, that he's not a bottom-end guy.  His conduct is

7    not the bottom end.  And we can describe hope and

8    expectations and belief.  We can say, well, give him a

9    longer period of supervised release.  I don't know of any

10   judge in this district that looks at supervised release as

11   punishment or as a substitute for punishment.  And I don't

12   even come into court and advocate that that's what it

13   should be.  Supervised release is trying to get the person

14   reintegrated into the community.  It's to rehabilitate

15   him, it's to help him.  It isn't to further punish him.

16   It's to provide him with the resources and the structure

17   that we don't have to send him back to prison.  Not to say

18   we're going to spread it out a little longer so we know we

19   can send you back if we want you to.

20           I've been in enough supervised release

21   violations in the 15 years I've done this to know that the

22   goal isn't to just send a person back to jail when they

23   stumble.  So I don't think we should be looking at

24   supervised release or the conditions as some sort of

25   substitute for what the Court must consider in imposing

 1   the actual sentence, and in this particular case the

 2   period of imprisonment, protection of the community.

 3   Supervised release does not address the current

 4   protection-of-the-community need that's present here.   It

 5   does not address the need to deter Mr. Amaral, which

 6   clearly nothing has deterred him in the many years in

 7   which he's been in and out of the criminal justice system.

 8           It strikes me that the conduct not just of what

 9   he did on April 28 but what he did after, which isn't

10   incorporated into the Sentencing Guidelines calculation.

11   He doesn't get an enhancement for going back out and

12   selling drugs, going back out there and associating with

13   the Latin Kings.  That's why the bottom end of the range,

14   in the government's view, is not appropriate.  It's not

15   minimally necessary.  A sentence at the high end of the

16   range is minimally necessary.  Because it does reflect the

17   seriousness of the offense.  It does attempt to impose

18   punishment.  It does better protect the community.  And it

19   sends the message I think to Mr. Amaral that you're lucky

20   in more ways than one.  You not only survived that

21   shooting, but the circumstance of the sentence you could

22   be facing now could have been a whole lot worse for you.

23   The State didn't have to nolle their cases.  The State

24   could have said, fine, we're going to go forward.

25           Eighty-seven months, Your Honor, is the

1    government's --

2           THE COURT:  You mentioned the State sending an

3    email I think in October of 2018.  Can you describe maybe

4    just what your -- I'm not sure what to make of that.

5           MR. LEAMING:  And I don't know what to make of

6    it either.  Attorney Frost and I had a spirited discussion

7    in a positive way yesterday about that.  And the State had

8    a pretty good case, right?  They had Mr. Amaral admitting

9    to the gun, they had recovered the gun, they had another

10   drug case.  The drug case for which he was actually

11   arrested was incorporated into our indictment.  So that

12   wasn't really going to, you know, move the case one way or

13   the other.  But they had him on a violation, he had

14   exposure to significant period of time in addition to the

15   new charges.  So when I had contacted the State's

16   Attorney's Office I just said, look, this is the

17   situation, we're trying to resolve the case, what is your

18   intention regarding your case?  And predicably the

19   question to me is, well, what's he going to get over

20   there?  And I said all I can tell you is what the

21   Sentencing Guidelines is going to be.  And the response

22   was, hey, look, if he gets at least 84 months, we'll nolle

23   our cases.  That was early communications I heard with

24   counsel.

25           When Mr. Amaral ultimately entered his guilty

1    plea, I notified the State's Attorney's Office that this

2    is sort of where we are.  And then I expected them to keep

3    the case open, frankly.  But they just went ahead and

4    nolle'd it.  Maybe because it had been on the docket for

5    so long.  So I don't expect that they're going to do

6    anything regardless of what the Court does.  But I think

7    the value there, if it's any value to Your Honor, is that

8    at least that's how they were viewing the seriousness of

9    his conduct.  What they thought would be an appropriate

10   disposition for all his cases was a sentence of 84 months

11   or more.  So I don't know what else to say about that.

12   Obviously the Court is not bound by that.

13            THE COURT:  I understand.  I just wanted to have

14   a better understanding of that.

15            MR. LEAMING:  And I think that's all I have.

16            Thank you, Your Honor.

17            THE COURT:  Thank you.

18            Mr. Frost.

19            MR. FROST:  Your Honor, Mr. Leaming just

20   addressed it.  I don't think the Court is inferring this,

21   but I just wanted to make it clear that it wasn't as

22   though I had made some representation to the State to

23   enter the nolles or that I had direct discussions.  I

24   think Mr. Leaming explained it, at one point in time there

25   was a discussion, 84 months was what the State was

1    thinking.  Obviously when we ultimately resolved the case

2    the range was 70 to 87 months.  I've been consistent that

3    I would ask for the lowest sentence I could accomplish

4    within reason and wanted the flexibility to at least argue

5    for the bottom of the range, the 70 to 87 months, just so

6    the Court understands a little bit more about the dynamic.

7    It's obviously a benefit to Mr. Amaral.  I think the

8    government, as I indicated I think in our memo and in

9    several ways, I think the U.S. Attorney's Office in this

10   case has made what I consider to be the right decisions

11   but they also benefit Mr. Amaral.  There are ways that

12   these cases can go that don't end up where we're just

13   arguing about 70 to 87 months.

14            THE COURT:  Of course.

15            MR. FROST:  In any event, I understand

16   Mr. Leaming's position about his skepticism.  I think you

17   can probably sense that I knew coming in here there was

18   going to be skepticism based on Mr. Amaral's record, and I

19   think Mr. Amaral was prepared to face some skeptics in

20   this courtroom.  The only thing I'll say is, to me the

21   choice for him is is he going to be surviving the rest his

22   life or is he going to be living the rest of his life.

23   The survival instinct is some of the stuff that

24   Mr. Leaming was alluding to, that you narrowly avoid

25   getting killed, you get shot, but you're still in survival

1    mode.  You're not thinking about how can I live a

2    productive life.  So you still navigate and survive.  At

3    some point that's got to stop.  And so that choice is his.

4           I think in terms of the sentence, a lot of the

5    arguments Mr. Leaming is making, they always trend in the

6    direction of longest sentence possible.  You know, protect

7    the public, longest sentence possible.  But that's not

8    what the sentencing statute says.  It's only one factor,

9    protecting the public.  Retribution is not the sole or

10   just pure punishment is not what the sentencing statute

11   speaks to.  It speaks to other things as well.

12          On the issue of supervised release, sitting

13   where I am and all the discussions I've had in state court

14   and federal court with clients, they would much prefer

15   flat time to a split sentence in state court with

16   something hanging over your head and a probation officer

17   in your house and calling you and testing you and all of

18   that.  Same goes for supervised release.  I can't tell you

19   how many times I have clients, "I want flat time."  The

20   State knows it's much more difficult to have a split

21   sentence or to have supervised release and have a

22   Judge Meyer up in your grill wondering what's going on,

23   what are the reports that we're getting, is this person

24   testing clean, are they getting a job.  If the defendant

25   wants to return to the life, that's not what they want.

```
 1   Flat time, they roll out and go right back into what
 2   you're doing.  That's easier.  So I do disagree with that.
 3   And I think that's why it's sort of -- it cuts both ways.
 4   It's more punishment.  In one sense, I'm a defense lawyer
 5   asking for something my client doesn't want.  But I also
 6   recognize that ultimately it's the way in which you can
 7   sort of get somebody into a place where they will succeed.
 8   Because to drop them on a street corner after prison isn't
 9   going to do it.  I think supervised release is a valuable
10   tool.  It is punishment, at least from the perspective of
11   most of my clients, including Mr. Amaral.  To the extent
12   the Court is leaning one way or the other, I think more
13   supervised release would be good for a person like
14   Mr. Amaral.
15              That's all I have.
16              THE COURT:  Thank you.
17              I appreciate the perspective of all parties.
18   I'm going to turn to the imposition of sentence at this
19   time.  You don't need to stand at this point.
20              I want to talk to you a bit, Mr. Amaral, about
21   what I have considered.
22              Under the law, I'm required to of course
23   consider what you did wrong to bring you into court, what
24   you've done wrong on many other occasions to bring you
25   into court.  I have to think about the rest of your life
```

1   in terms of the challenges that you've had that I've heard

2   about from the Presentence Report, your family that you

3   have, the support that you've had.

4           I have to think about -- and you've heard the

5   attorneys talking a lot about the purposes of a criminal

6   sentence.  And one of them certainly is just punishment

7   and what promotes respect for the law, reflects the

8   seriousness of doing something like having a gun in broad

9   daylight, basically a gun battle.  I have to think about

10  deterring, discouraging you, in other words, from going

11  back to this again.  You heard Mr. Leaming talk about, and

12  I share the concern, about the fact that you could go

13  back, based on your track record, and do more of this

14  again.  To some extent I have to be concerned about

15  thinking about what others might do.  That's lesser in my

16  mind, but still I'm required to think about that.  I have

17  to think about what the law calls rehabilitation,

18  basically what we've already talked about in terms of

19  making sure that you have the support that encourages you

20  to make better decisions than you've done by vocational

21  training or substance abuse, mental health counseling if

22  it were something you wanted.  I have to avoid any kind of

23  unwarranted differences that you might receive than those

24  in similar circumstances as you would receive.

25          Basically, I've got to think about everything

1    that I know and I've learned about you and to decide on a

2    sentence that's fair and just and reasonable, also, as

3    Mr. Frost has reminded me, one that's not greater than

4    necessary to serve the purposes I just talked about of

5    sentencing.

6           So for you, you know the concerns here.  It's a

7    long and sorry record of drugs or guns and other things

8    that are littered throughout your conviction record and

9    the cycle of doing it kind of heedlessly, the fact that

10   you're on probation or release terms.  The fact that

11   you've had a history -- I'm glad to see that it seems like

12   in the last year and a half in state custody you've done

13   better on the disciplinary side.  Before that, boy, you

14   were racking up the disciplinary tickets.

15          I am discouraged by the fact that you have done

16   quite little to try to get legit employment when you were

17   out.  I mean, there's some instances where you had some

18   for a while.  But you kind of had I think some times where

19   you could have made a fresh start of it and you took maybe

20   the easy way out under the influence of people like Velez.

21          And then the other concern is how it is you

22   decided to do it with the Latin Kings of all organizations

23   that itself has such a reprehensible record of violence

24   and drug dealing.  It's kind of its business model and

25   inspiring, somehow, people to look up to that.  I

1    appreciate the fact that you told me you actually looked

2    up to those type of people at one point in time, no

3    longer.

4              I see things on the other side for you that are

5    in your favor.

6              I do think that my view of basically your

7    growing up years, especially the time when you were ten

8    and later, essentially living in the car, the street stuff

9    that went on, the stunningly abusive basically stepfather

10   that you had there that essentially pretty much pushed you

11   in the direction of making the kinds of choices you have,

12   almost maybe seeing the Latin Kings as some sort of

13   alternative family, perhaps.  Not to suggest that that was

14   the right choice, but kind of makes it more understandable

15   than if you had had a more normal childhood.

16             I think weighing in your favor as well is you

17   continue to have the support of your family.  Mr. Leaming

18   is absolutely right when he says, oh, you weren't thinking

19   much about your three kids when you were out there in

20   April of 2017 doing Mr. Velez's bidding, taking the gun.

21   And then later on with the drug sales, you weren't

22   thinking about them then.

23             So as I look back at everything I have in front

24   of me, I certainly agree more prison time is fully

25   appropriate.  I don't think, and I agree with Mr. Leaming,

1   that you're not, as I think he puts it, a

2   bottom-of-the-range person, because you're not.  Because

3   you haven't actually with your specific acts that you've

4   taken shown a track record.  Not just words.  Your words

5   do mean something to me, but it's what you actually do in

6   the harder day-to-day commitment that makes a difference.

7   I think you can turn that around, but you have not to

8   date.  So I look at that and that's a strike against you.

9   And that's why I am not considering a sentence at the very

10  bottom of the Sentencing Guidelines range.

11          A closer question is whether I should impose a

12  sentence at the very top as Mr. Leaming, with quite good

13  reason, suggests I should do.  I've decided not to do

14  that.  I'm going to impose a sentence that's more in the

15  middle.  Because in part what you've talked to me about

16  today in terms of what I understand from what you talked

17  about discounting, as Mr. Leaming wisely tells me to do,

18  to some extent, reliance on just words.  That's part of

19  it.  But I'm also struck by the childhood challenges that

20  you've had here that do make you a bit different than

21  people in different circumstances there.  So I'm going to

22  give you a little bit, a little bit of the benefit of the

23  doubt here.  It would be a shame if I turned out to be

24  wrong, how regrettable if Mr. Leaming comes back and says,

25  Judge, I was right there.  You get to decide if

1    Mr. Leaming is absolutely right about that very dark view

2    of yourself.  But I'm going to give you some benefit of a

3    doubt and impose a sentence right in the middle of the

4    Sentencing Guidelines range.

5              So I'll ask you to stand at this time, sir.

6              Mr. Joshua Amaral, I'm sentencing you to a term

7    of 18 months of imprisonment on Count Three of the

8    indictment and 60 months to be served consecutively on

9    Count Four of the indictment, and that's with credit from

10   the date that you've been in state custody or starting

11   that sentence effective September 13, 2017.

12             I'm placing you on supervised release for five

13   years.  It's not in the kind of classic custody sense

14   punishment, but you're going to have a probation officer

15   that you're reporting to, especially intensively during

16   the first year or two of that period unless you kind of

17   prove yourself.

18             I'm not imposing a criminal fine because I think

19   you need to save your money and build a career actually

20   that you're very capable of doing.

21             I'll impose a $200 special assessment.

22             Now, we talked about some of the conditions of

23   supervised release before.  They include, of course, the

24   standard conditions under the Sentencing Guidelines

25   5D1.3(c).  They include as well the mandatory conditions.

1    Those mandatory conditions are, of course, that you not

2    commit another federal, state, or local offense; that you

3    not unlawfully possess a controlled substance, that's even

4    marijuana; that you refrain from any unlawful use of a

5    controlled substance and submit to a drug test within 15

6    days of release and at least two periodic drug tests

7    thereafter; and that you cooperate in the collection of a

8    DNA sample to the extent it's required by law.

9              And I'm also imposing those special conditions

10   that we talked about from Paragraph 121 of the Presentence

11   Report, I adopt those in full.

12             So those are the conditions of supervised

13   release.  I think that's it in terms of the sentence that

14   the Court's imposing.

15             Apart from whether you agree with the sentences,

16   is there any reason why the Court cannot lawfully impose

17   the sentence that I just imposed?

18             MR. LEAMING:  No, Your Honor.

19             MR. FROST:  No, Your Honor.

20             THE COURT:  I will make the designation

21   recommendation to USP Allenwood.

22             MR. FROST:  Thank you, Your Honor.

23             THE COURT:  And the judgment of the Court will

24   be prepared for my approval by the Clerk's Office.

25             You do have the right to appeal under certain

 1   circumstances, Mr. Amaral.  They may be limited by your

 2   plea agreement.  If you wish to appeal either the

 3   conviction or the sentence in this case, you have to make

 4   sure to do that within the next 14 days.  If you don't

 5   have counsel appointed to represent you for appeal or,

 6   rather, you can't afford counsel to represent you for an

 7   appeal, you'd have counsel appointed to represent you.  Do

 8   you understand that, sir?

 9            THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  Is there anything else at this time?

11   Dismissal of counts?

12            MR. LEAMING:  Yes.

13            Your Honor, Count 1 should be dismissed as it

14   relates to Mr. Amaral.  And then Counts 6, 18, and 19 may

15   be dismissed.

16            THE COURT:  So dismissed.

17            Anything else?

18            MR. FROST:  No, Your Honor.

19            THE COURT:  Thank you all.

20            Stand in recess.

21                (Proceedings adjourned at 12:12 p.m.)

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. JOSHUA AMARAL

5                      No. 3:18CR90(JAM)

6

7

8          I, Diana Huntington, RDR, CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages 1 through 54 are a true and accurate

12   transcription of my shorthand notes taken in the

13   aforementioned matter to the best of my skill and ability.

14

15

16

17

18        _____/s/_____

19                  DIANA HUNTINGTON, RDR, CRR
                       Official Court Reporter
20                  United States District Court
                      141 Church Street, Room 147
21                  New Haven, Connecticut 06510
                         (860) 463-3180
22

23

24

25